UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :        INDICTMENT

          - v. -                            :

DAVID B. CHALMERS, JR.,                      :        S3 05 Cr. 59 (DC)
OSCAR S. WYATT, JR.,
TONGSUN PARK,                                :
JOHN IRVING,
LUDMIL DIONISSIEV,                           :
CATALINA del SOCORRO MIGUEL FUENTES,
     a/k/a "Cathy Miguel,"
MOHAMMED SAIDJI,
BAYOIL (USA), INC.,
BAYOIL SUPPLY & TRADING LIMITED,
NAFTA PETROLEUM COMPANY LIMITED,
MEDNAFTA TRADING COMPANY LIMITED, and
SARENCO, S.A.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - -x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: JAN 2 3 2006

## COUNT ONE

### (Conspiracy to Commit Wire Fraud and to Engage in Prohibited Financial Transactions with Iraq)

The Grand Jury charges:

### THE OIL-FOR-FOOD PROGRAM

1.   On or about August 6, 1990, approximately four days after the Iraqi army invaded Kuwait, the United Nations imposed economic sanctions on the Government of Iraq.  These sanctions prohibited member states of the United Nations from, among other things, trading in any Iraqi commodities or products. The United Nations continued to enforce these sanctions up to and including in or about 2003.

2.   On or about April 14, 1995, the Security Council

of the United Nations adopted Resolution 986, which authorized
the Government of Iraq to sell oil under certain conditions —
principally, that the proceeds of all sales of Iraqi oil were to
be deposited into an escrow bank account monitored by the United
Nations and used only to purchase various humanitarian goods for
the benefit of the Iraqi people.  The Government of Iraq agreed
in writing in or about May 1996 to the terms of Security Council
Resolution 986 after more than a year of negotiations over the
particular methods of implementing this arrangement.

     3.    The United Nations Office of Iraq Programme, Oil-
for-Food (the "Oil-for-Food Program") was subsequently
established to administer, among other things, the sale of oil
and purchase of humanitarian goods by Iraq.  A special bank
account was established at a bank in Manhattan (the "Oil-for-Food
Bank Account") to handle these sales and purchases.  The United
Nations' economic sanctions on Iraq remained in place for all
trade and transactions not authorized by the Oil-for-Food
Program.

     4.    During the operation of the Oil-for-Food Program,
federal law prohibited United States companies and individuals
from executing contracts and engaging in a variety of
transactions with the Government of Iraq unless they received a
license issued by the Department of Treasury's Office of Foreign
Assets Control.

5.   The Government of Iraq began selling oil pursuant to the Oil-for-Food Program in or about December 1996.  Between in or about December 1996 and December 2002, the Security Council of the United Nations adopted a series of resolutions that re-authorized the Oil-for-Food Program for approximately thirteen 180-day phases of operation.  Throughout each of these phases, the price at which Iraqi oil was sold under the Oil-for-Food Program — known as the Official Selling Price ("O.S.P.") — was established by a committee made up of member states of the Security Council in Manhattan upon the recommendation of a rotating group of United Nations oil overseers.  The United Nations sought to set a price for Iraqi oil at the highest rate bearable by the market in order to maximize the revenue generated by the Oil-for-Food Program.  This, in turn, would increase the amount of humanitarian goods that could be purchased through the Oil-for-Food Program for the Iraqi people.

6.   Under the Oil-for-Food Program, the Government of Iraq alone had the power to select the companies and individuals who received the rights to purchase Iraqi oil.  During every phase of the Oil-for-Food Program, officials at the highest levels of the Government of Iraq selected a group of companies and individuals to receive the rights to purchase certain quantities of Iraqi oil at a certain price per barrel (frequently referred to as "allocations" of oil).  These companies and

3

individuals — many of whom were not otherwise involved in the oil industry — were able to reap large profits by selling their allocations of Iraqi oil to brokers and/or companies capable of transporting the oil to a refinery.

7.    From at least in or about 2000, up to and including in or about March 2003, officials of the Iraqi Government conditioned the distribution of allocations of oil under the Oil-for-Food Program on the recipients' willingness to pay a secret surcharge to the Government of Iraq (hereinafter, the "Surcharge Scheme").  The Government of Iraq directed that these surcharges — representing a percentage of the total amount of each oil contract and totaling at least several hundred million dollars — be paid to front companies and/or bank accounts under the control of the Iraqi Government in various countries in the Middle East and elsewhere.

<u>THE DEFENDANTS</u>

8.    At all times relevant to this Indictment, DAVID B. CHALMERS, JR., the defendant, was a citizen of the United States, a resident of Houston, Texas, and the sole shareholder of BAYOIL (USA), INC., the defendant, which was an oil company based in Houston, Texas, and incorporated in the State of Delaware.

9.    At all times relevant to this Indictment, DAVID B. CHALMERS, JR., the defendant, was the sole shareholder of BAYOIL SUPPLY & TRADING LIMITED, the defendant, which was a company

4

based in Nassau, Bahamas, and incorporated in the Bahamas.  At all times relevant to this Indictment, accounting, business, and other affairs for BAYOIL SUPPLY & TRADING LIMITED were conducted from the Houston offices, and by the employees, of BAYOIL (USA), INC., the defendant (collectively, the "BAYOIL COMPANIES").

10.  At all times relevant to this Indictment, JOHN IRVING, the defendant, was a citizen of the United Kingdom, a resident of London, England, and an oil trader.  Between at least in or about 2000, up to and including in or about March 2003, IRVING and DAVID B. CHALMERS, JR., the defendant, worked together to purchase Iraqi oil on behalf of the BAYOIL COMPANIES, the defendants.

11.  At all times relevant to this Indictment, LUDMIL DIONISSIEV, the defendant, was a citizen of Bulgaria, a legal permanent resident alien of the United States, a resident of Houston, Texas, and an oil trader.  Between at least in or about 2000, up to and including in or about March 2003, DIONISSIEV and DAVID B. CHALMERS, JR., the defendant, worked together to purchase Iraqi oil on behalf of the BAYOIL COMPANIES, the defendants.

12.  At all times relevant to this Indictment, OSCAR S. WYATT, JR., the defendant, was a citizen of the United States and a resident of Houston, Texas.  From at least in or about December 1996, up to and including in or about January 2001, WYATT served

as Chairman of the Board of Directors of the Coastal Corporation,
which was an oil company based in Houston, Texas, and
incorporated in the State of Delaware.  In or about December
1996, WYATT, on behalf of the Coastal Corporation, received the
first allocation of oil — approximately 11.35 million barrels —
awarded by the Government of Iraq under the Oil-for-Food Program.
In or about January 2001, the Coastal Corporation was acquired by
El Paso Energy Corporation ("El Paso"), which was an energy
company based in Houston, Texas, and incorporated in the State of
Delaware.  Subsequent to the acquisition of the Coastal
Corporation by El Paso, WYATT established a new corporate entity,
NuCoastal Corporation, which was an energy company based in
Houston, Texas.  From in or about January 2001, up to and
including in or about March 2003, WYATT acted as an oil
consultant and/or oil trader for, among others, NAFTA PETROLEUM
COMPANY LIMITED (based and incorporated in Cyprus), and MEDNAFTA
TRADING COMPANY LIMITED (based and incorporated in Cyprus), the
defendants (collectively, the "WYATT FOREIGN COMPANIES").

         13.  At all times relevant to this Indictment, CATALINA
del SOCORRO MIGUEL FUENTES ("MIGUEL"), a/k/a "Cathy Miguel," and
MOHAMMED SAIDJI, the defendants, were citizens of Switzerland,
residing in Geneva.  At all times relevant to this Indictment,
MIGUEL and SAIDJI together operated SARENCO, S.A., the defendant,
a consulting firm based and incorporated in Switzerland.  From at

least in or about 1999, up to and including in or about March
2003, in close consultation with OSCAR S. WYATT, JR., the
defendant, MIGUEL and SAIDJI together operated the WYATT FOREIGN
COMPANIES, the defendants.  Furthermore, from at least in or
about December 1999, up to and including in or about March 2003,
MIGUEL served as a consultant for NuCoastal Corporation and at
least two of its subsidiaries, NuCoastal Trading Company and
NuCoastal Trading Company, S.A.

<u>MEANS AND METHODS OF THE CONSPIRACY</u>

14.  At all times relevant to this Indictment, OSCAR S.
WYATT, JR., the defendant, directed, arranged for, and supervised
the purchase of Iraqi oil by the Coastal Corporation and the
WYATT FOREIGN COMPANIES —— in association with and with
assistance from CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy
Miguel," and MOHAMMED SAIDJI, the defendants —— from the
Government of Iraq pursuant to the Oil-for-Food Program.  WYATT,
MIGUEL, SAIDJI, and the WYATT FOREIGN COMPANIES obtained this
Iraqi oil by, among other things, paying the O.S.P. to the Oil-
for-Food Bank Account.

15.  At all times relevant to this Indictment, DAVID B.
CHALMERS, JR., the defendant, directed, arranged for, and
supervised the purchase of Iraqi oil by the BAYOIL COMPANIES, the
defendants, from recipients of oil allocations under the Oil-for-
Food Program or from brokers working on behalf of those

recipients.   In purchasing these allocations of Iraqi oil, CHALMERS and the BAYOIL COMPANIES followed the typical industry practice by paying (a) the O.S.P. to the Oil-for-Food Bank Account, and (b) a commission to the allocation-holder and/or broker.   The commissions represented, in theory, a portion of the price above the O.S.P. that the oil market could bear.

16.   After purchasing Iraqi oil, as described above, representatives of the BAYOIL COMPANIES, the defendants, including DAVID B. CHALMERS, Jr., JOHN IRVING, and LUDMIL DIONISSIEV, the defendants, (with respect to oil purchased by the BAYOIL COMPANIES) and OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI, the defendants, (with respect to oil purchased by the WYATT FOREIGN COMPANIES) arranged through facsimile and electronic mail transmissions, as well as telephone calls, for cargo ships to load the oil from Iraq and transport it to downstream purchasers (usually, larger oil companies with their own refineries).

17.   On a regular basis from at least in or about 1997, up to and including in or about March 2003, DAVID B. CHALMERS, JR., the defendant — on behalf of the BAYOIL COMPANIES, the defendants — and OSCAR S. WYATT, JR., the defendant — on behalf of the WYATT FOREIGN COMPANIES, the defendants — offered advice about market conditions to the United Nations oil overseers in Manhattan and to officials of the Government of Iraq in Baghdad

8

in an effort to influence the overseers' recommendation of an
O.S.P.  CHALMERS and WYATT offered this advice through facsimile
transmissions, telephone calls, and/or face-to-face meetings in
both Manhattan and Baghdad.  LUDMIL DIONISSIEV, the defendant,
joined CHALMERS in Baghdad on at least one occasion for this
purpose, among others, and DIONISSIEV and JOHN IRVING, the
defendant, both assisted CHALMERS in disseminating market
information to Iraqi officials via facsimile.  CHALMERS and WYATT
consulted with each other, and with representatives of each
other's companies, in an effort to ensure that they were making
consistent recommendations to the oil overseers and to officials
of the Government of Iraq.

        18.   The Government of Iraq began implementing the
Surcharge Scheme in or about mid-2000.  Iraqi Government
officials indicated to co-conspirators not named as defendants
herein that any companies or individuals refusing to participate
in the Surcharge Scheme would be barred from further
participation in the Oil-for-Food Program.  In addition, at
various times relevant to this Indictment, the Government of Iraq
required the payment of unauthorized fees before cargo ships
would be permitted to load oil at Iraqi ports.  Payment of these
so-called "port fees" was not made to the Oil-for-Food Bank
Account and violated United States laws and regulations.

        19.   From in or about mid-2000, up to and including at

least in or about late 2002, DAVID B. CHALMERS, JR., the
defendant, on behalf of the BAYOIL COMPANIES, the defendants, and
OSCAR S. WYATT, JR., the defendant, on behalf of the Coastal
Corporation and the WYATT FOREIGN COMPANIES, the defendants,
separately, together, and with officials of the Government of
Iraq and other co-conspirators not named as defendants herein,
lobbied the United Nations to select an O.S.P. at a level that
would allow recipients of oil allocations from Iraq to pay the
required surcharge and still retain a profit for themselves.  A
below-market O.S.P. would enable the Government of Iraq to
achieve its objective of collecting the illegal surcharges on oil
allocated pursuant to the Oil-for-Food Program.

      20.  From in or about December 2000, up to and
including at least in or about March 2003, OSCAR S. WYATT, JR.,
CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and
MOHAMMED SAIDJI, the defendants — on behalf of the Coastal
Corporation, the WYATT FOREIGN COMPANIES, the defendants, and
SARENCO, S.A., the defendant — agreed to pay, paid, and caused
to be paid millions of dollars of secret illegal surcharges to
the Government of Iraq.  These secret illegal surcharge payments
covered oil purchased directly from the Government of Iraq from
in or about mid-2000, up to and including in or about mid-2002,
by WYATT, MIGUEL, and SAIDJI on behalf of the Coastal
Corporation, and the WYATT FOREIGN COMPANIES.  To conceal these

illegal surcharge payments, WYATT, MIGUEL, SAIDJI, and SARENCO, S.A., caused foreign-based co-conspirators not named as defendants herein to deposit millions of dollars in a bank account controlled by the Government of Iraq and located at the Jordan National Bank in Amman, Jordan.  By participating in this Surcharge Scheme and bypassing the Oil-for-Food Program, WYATT, MIGUEL, SAIDJI, the WYATT FOREIGN COMPANIES, and SARENCO, S.A., caused funds to be diverted from the Oil-for-Food Bank Account that otherwise would have been available to purchase humanitarian goods under the Oil-for-Food Program.

21.  At various times relevant to this Indictment, the Coastal Corporation, and its successor entity, El Paso, regularly recorded telephone calls placed to or from its oil traders on their office telephones.  In several of those recorded conversations, OSCAR S. WYATT, JR., the defendant, discussed his participation in the Surcharge Scheme with an El Paso trader, including, but not limited to, WYATT's use of foreign companies operated by CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI, the defendants, to make illegal payments to the Government of Iraq on WYATT's behalf.

22.  From in or about April 2001, up to and including at least in or about September 2001, DAVID B. CHALMERS, JR., the defendant, on behalf of the BAYOIL COMPANIES, the defendants, agreed to pay, paid, and caused to be paid millions of dollars of

secret illegal surcharges to the Government of Iraq.  These secret illegal surcharge payments covered oil purchased from in or about mid-2000, up to and including in or about early 2001, by CHALMERS and the BAYOIL COMPANIES from a foreign company that was operated by co-conspirators not named as defendants herein (the "Bayoil Foreign Company") and whose operations were funded almost exclusively by CHALMERS and the BAYOIL COMPANIES.  To conceal these illegal surcharge payments, CHALMERS agreed to pay the Bayoil Foreign Company inflated commission prices on the original oil transactions, with the knowledge and expectation that the Bayoil Foreign Company would then make the surcharge payments to the Government of Iraq.  Based on instructions from Iraqi officials, representatives of the BAYOIL COMPANIES sent these illegal surcharge payments via wire transfers through the Bayoil Foreign Company to, among other locations, a bank account of Al Wasel and Babel General Trading (L.L.C.), a front company for the Government of Iraq, located in the United Arab Emirates.

23.  From in or about 2001, up to and including in or about March 2003, DAVID B. CHALMERS, JR., JOHN IRVING, LUDMIL DIONISSIEV, and the BAYOIL COMPANIES, the defendants, while knowingly participating in the Surcharge Scheme, continuously purchased Iraqi oil under the Oil-for-Food Program.  CHALMERS, IRVING, DIONISSIEV, and the BAYOIL COMPANIES paid inflated commissions to sellers of Iraqi oil allocations, including the

Bayoil Foreign Company and others, with the knowledge and expectation that the sellers would use some portion of those inflated commissions to satisfy their illegal surcharge obligations to the Government of Iraq.  By participating in this Surcharge Scheme and bypassing the Oil-for-Food Program, CHALMERS, IRVING, DIONISSIEV, and the BAYOIL COMPANIES caused funds to be diverted from the Oil-for-Food Bank Account that otherwise would have been available to purchase humanitarian goods under the Oil-for-Food Program.

<u>THE VIOLATION</u>

24.  From at least in or about mid-2000, up to and including in or about March 2003, in the Southern District of New York and elsewhere, DAVID B. CHALMERS, JR., OSCAR S. WYATT, JR., JOHN IRVING, LUDMIL DIONISSIEV, CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," MOHAMMED SAIDJI, BAYOIL (USA), INC., BAYOIL SUPPLY & TRADING LIMITED, NAFTA PETROLEUM COMPANY LIMITED, MEDNAFTA TRADING COMPANY LIMITED, and SARENCO, S.A., the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Sections 1343 and 2332d of Title 18, United States Code.

25.  It was a part and an object of the conspiracy that DAVID B. CHALMERS, JR., OSCAR S. WYATT, JR., JOHN IRVING, LUDMIL

13

DIONISSIEV, CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy

Miguel," MOHAMMED SAIDJI, BAYOIL (USA), INC., BAYOIL SUPPLY &

TRADING LIMITED, NAFTA PETROLEUM COMPANY LIMITED, MEDNAFTA

TRADING COMPANY LIMITED, and SARENCO, S.A., the defendants, and

others known and unknown, unlawfully, willfully, and knowingly,

having devised and intending to devise a scheme and artifice to

defraud, and for obtaining money and property by means of false

and fraudulent pretenses, representations, and promises, would

and did transmit, and cause to be transmitted by means of wire,

radio, and television communication in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds for the

purpose of executing such scheme and artifice, in violation of

Title 18, United States Code, Section 1343.

26.   It was further a part and an object of the

conspiracy that DAVID B. CHALMERS, JR., OSCAR S. WYATT, JR., JOHN

IRVING, LUDMIL DIONISSIEV, CATALINA del SOCORRO MIGUEL FUENTES,

a/k/a "Cathy Miguel," MOHAMMED SAIDJI, BAYOIL (USA), INC.,

BAYOIL SUPPLY & TRADING LIMITED, NAFTA PETROLEUM COMPANY LIMITED,

MEDNAFTA TRADING COMPANY LIMITED, and SARENCO, S.A., the

defendants, and others known and unknown, at least one of whom

was a United States person, and knowing and having reasonable

cause to know that Iraq was a country designated under section

6(j) of the Export Administration Act of 1979 as a country

supporting international terrorism, would and did unlawfully and

14

knowingly engage in financial transactions with the government of that country without complying with the licensing and authorization requirements of the Iraqi Sanction Regulations, in violation of Section 2332d of Title 18, United States Code.

OVERT ACTS

27.   In furtherance of the charged conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about Fall 2000, at a meeting in Vienna, Austria, officials of the Government of Iraq notified two representatives of the Coastal Corporation that any future allocations of Iraqi oil under the Oil-for-Food Program would be conditioned on the recipients' payment of an illegal surcharge to the Government of Iraq.

b.   In or about November 2000, DAVID B. CHALMERS, JR., faxed documents to OSCAR S. WYATT, JR., regarding pricing information that CHALMERS was sending to officials of the Government of Iraq in Baghdad and to officials of the United Nations in Manhattan.

c.   On or about November 15, 2000, a representative of the BAYOIL COMPANIES sent via facsimile to OSCAR S. WYATT, JR., a newspaper article reporting that the Government of Iraq was demanding an illegal surcharge on oil

allocated under the Oil-for-Food Program.

   d. In or about late 2000, OSCAR S. WYATT, JR., received an allocation of approximately 8 million barrels of oil from the Government of Iraq.

   e. In or about December 2000, the Bayoil Foreign Company received an allocation of approximately 37 million barrels of oil from the Government of Iraq.

   f. In or about December 2000, DAVID B. CHALMERS, JR., on behalf of the BAYOIL COMPANIES, contracted with the Bayoil Foreign Company to purchase the oil allocation described above in Paragraph 27(e).

   g. In or about December 2000, DAVID B. CHALMERS, JR., on behalf of the BAYOIL COMPANIES, sent a letter via facsimile to officials of the Government of Iraq in which CHALMERS proposed a pricing mechanism that could be used to seek a lower O.S.P. for Iraqi oil.

   h. On or about December 14, 2000, OSCAR S. WYATT, JR., sent messages via electronic mail and facsimile to officials of the Government of Iraq in which WYATT proposed a pricing mechanism that could be used to seek a lower O.S.P. for Iraqi oil.

   i. From in or about April 2001, up to and including in or about September 2001, representatives of the Bayoil Foreign Company located outside the United States faxed

invoices to representatives of the BAYOIL COMPANIES in Houston, Texas, requesting funds with which to pay illegal surcharges to Al Wasel and Babel General Trading (L.L.C.).

j.   In or about April 2001, DAVID B. CHALMERS, JR., asked OSCAR S. WYATT, JR., to hand-deliver a letter from CHALMERS to an official of the Government of Iraq in which CHALMERS sought favorable consideration from the Iraqis on future shipments of Iraqi oil based on his and the BAYOIL COMPANIES' long history of cooperation with the Government of Iraq.

k.   From on or about May 7, 2001, up to and including on or about May 13, 2001, OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI caused approximately $590,000 in cash to be deposited in a bank account controlled by the Government of Iraq at the Jordan National Bank in Amman.

l.   From on or about May 30, 2001, up to and including on or about June 5, 2001, OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI caused approximately $390,000 in cash to be deposited in a bank account controlled by the Government of Iraq at the Jordan National Bank in Amman.

m.   On or about June 14, 2001, in a recorded telephone conversation, DAVID B. CHALMERS, JR. recommended to an El Paso oil trader that the trader oppose the pricing policies

17

for Iraqi oil recently adopted by the United Nations as part of the United Nations' efforts to eliminate the Surcharge Scheme.

n.    In or about mid-2001, OSCAR S. WYATT, JR., received an allocation of approximately 10 million barrels of oil from the Government of Iraq.

o.    On or about July 3, 2001, in a recorded telephone conversation, OSCAR S. WYATT, JR., and CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," negotiated a sale of Iraqi oil with an El Paso oil trader in the course of which WYATT asked the El Paso oil trader to post a letter of credit on their (WYATT and MIGUEL's) behalf.

p.    On or about July 5, 2001, in a recorded telephone conversation, OSCAR S. WYATT, JR., and CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," negotiated a sale of Iraqi oil with an El Paso oil trader in the course of which WYATT asked the El Paso oil trader to fax a draft contract to MOHAMMED SAIDJI at SARENCO, S.A., in Geneva.

q.    On or about July 11, 2001, OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI caused approximately $588,000 in cash to be deposited in a bank account controlled by the Government of Iraq at the Jordan National Bank in Amman.

r.    On or about August 13, 2001, representatives of the BAYOIL COMPANIES sent via wire transfer approximately

18

$1,287,771.60 to a bank account in Switzerland controlled by a representative of the Bayoil Foreign Company.

s. On or about August 24, 2001, a representative of the Bayoil Foreign Company sent approximately $1,092,345 via wire transfer, which passed through a bank in Manhattan, to a bank account of Al Wasel and Babel General Trading (L.L.C.), located in the United Arab Emirates.

t. From on or about August 26, 2001, up to and including on or about August 29, 2001, OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI caused approximately $501,350 in cash to be deposited in a bank account controlled by the Government of Iraq at the Jordan National Bank in Amman.

u. In or about August 2001, a co-conspirator not named as a defendant herein ("CC-1") received an allocation of approximately two million barrels of oil from the Government of Iraq under the Oil-for-Food Program.

v. In or about August 2001, LUDMIL DIONISSIEV, in conjunction with DAVID B. CHALMERS, JR., and on behalf of the BAYOIL COMPANIES, negotiated a contract with a representative of CC-1 to purchase the oil allocation described above in Paragraph 27(u).

w. On or about October 4, 2001, pursuant to the contract described above in Paragraph 27(v), representatives of

the BAYOIL COMPANIES paid CC-1 a commission of approximately
$839,368.40 via wire transfer, and CC-1 thereafter conveyed
approximately $629,526.30 of this commission to representatives
of the Government of Iraq.

        x.   In or about September 2001, a co-conspirator
not named as a defendant herein ("CC-2") brokered a sale to DAVID
B. CHALMERS, JR., and the BAYOIL COMPANIES of an allocation of
approximately one million barrels of oil awarded to another co-
conspirator not named as a defendant herein ("CC-3") by the
Government of Iraq under the Oil-for-Food Program.

        y.   In or about September and October 2001, JOHN
IRVING, in conjunction with DAVID B. CHALMERS, JR., and on behalf
of the BAYOIL COMPANIES, negotiated with CC-2 a contract to
purchase CC-3's oil allocation described above in Paragraph
27(x).

        z.   On or about October 4, 2001, pursuant to the
contract described above in Paragraph 27(y), representatives of
the BAYOIL COMPANIES sent to CC-3 a commission of approximately
$450,885.45 via wire transfer, and CC-3 thereafter conveyed
approximately $300,000 of this commission to representatives of
the Government of Iraq.

        aa.  On or about October 4, 2001, in a recorded
telephone conversation, OSCAR S. WYATT, JR. told an El Paso oil
trader that he (WYATT) had paid port fees to the Government of

Iraq and offered to have CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," pay those fees on behalf of El Paso.

       bb.   On or about October 25, 2001, OSCAR S. WYATT, JR., sent a message via electronic mail and facsimile to the Minister of Oil of the Government of Iraq in which WYATT complained about "the last cargo of my contract for Phase 10."

       cc.   On or about November 29, 2001, in a recorded telephone conversation, OSCAR S. WYATT, JR., told an El Paso oil trader that he (WYATT) would have CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," make an illegal surcharge payment to the Government of Iraq.

       dd.   On or about December 4, 2001, MOHAMMED SAIDJI, on behalf of SARENCO, S.A., sent via facsimile an invoice for $200,000 to officials of El Paso.

       ee.   On or about December 9, 2001, OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI caused approximately 222,000 Euros in cash to be deposited in a bank account controlled by the Government of Iraq at the Jordan National Bank in Amman.

       ff.   On or about December 21, 2001, in a recorded telephone conversation, OSCAR S. WYATT, JR., asked an El Paso oil trader whether representatives of El Paso had approved reimbursement to SARENCO, S.A., of "that $200,000 I've already paid to the bastards over there."

gg.   In or about early 2002, OSCAR S. WYATT, JR., received an allocation of approximately 8.1 million barrels of oil from the Government of Iraq.

hh.   In or about February 2002, OSCAR S. WYATT, JR., told a representative of El Paso that he (WYATT) had caused SARENCO, S.A., to pay approximately $200,000 to the Government of Iraq.

ii.   On or about March 25, 2002, OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI caused approximately 350,000 Euros in cash to be deposited in a bank account controlled by the Government of Iraq at the Jordan National Bank in Amman.

jj.   In or about March 2002, another co-conspirator not named as a defendant herein ("CC-4") caused a letter to be sent to a high-ranking official of the Government of Iraq in Baghdad in which CC-4 outlined a plan to settle the illegal surcharge obligation owed by CC-4 as a result of an oil transaction brokered in or about 2000 by JOHN IRVING, DAVID B. CHALMERS, JR., and the BAYOIL COMPANIES.

kk.   From on or about March 27, 2002, up to and including on or about April 1, 2002, OSCAR S. WYATT, JR., CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," and MOHAMMED SAIDJI caused approximately 1,150,000 Euros in cash to be deposited in a bank account controlled by the Government of Iraq at the Jordan National Bank in Amman.

ll.   In or about mid-2002, OSCAR S. WYATT, JR., received an allocation of approximately 4 million barrels of oil from the Government of Iraq.

mm.   On or about July 21, 2002, a representative of the Bayoil Foreign Company delivered to officials of the Government of Iraq a letter that was drafted in consultation with DAVID B. CHALMERS, JR., and that proposed a payment plan for certain illegal surcharges owed by CC-4 and others.

nn.   On or about August 16, 2002, OSCAR S. WYATT, JR., sent a letter via facsimile to an official of the United Nations in Manhattan that WYATT signed "Oscar Wyatt, Director, Mednafta."

oo.   On or about January 15, 2003, OSCAR S. WYATT, JR., sent via facsimile a letter — on stationery of MEDNAFTA TRADING COMPANY LIMITED — to an official of the Government of Iraq proposing a meeting in Baghdad in late January 2003.

(Title 18, United States Code, Sections 371 and 1349.)

<u>COUNT TWO</u>

(Wire Fraud)

The Grand Jury further charges:

28.   Paragraphs One through Twenty-Three and Twenty-Seven of this Indictment are realleged, repeated, and incorporated by reference as if fully set forth herein.

29.   From at least in or about mid-2000, up to and including in or about March 2003, in the Southern District of New

York and elsewhere, DAVID B. CHALMERS, JR., OSCAR S. WYATT, JR.,
JOHN IRVING, LUDMIL DIONISSIEV, CATALINA del SOCORRO MIGUEL
FUENTES, a/k/a "Cathy Miguel," MOHAMMED SAIDJI, BAYOIL (USA),
INC., BAYOIL SUPPLY & TRADING LIMITED, NAFTA PETROLEUM COMPANY
LIMITED, MEDNAFTA TRADING COMPANY LIMITED, and SARENCO, S.A., the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, transmitted and caused to be transmitted by means of
wire, radio, and television communication in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds
for the purpose of executing such scheme and artifice, to wit,
CHALMERS, WYATT, IRVING, DIONISSIEV, MIGUEL, SAIDJI, the BAYOIL
COMPANIES, the WYATT FOREIGN COMPANIES, and SARENCO, S.A.,
attempted to and did employ telephone calls, facsimile
transmissions, electronic mail messages, and wire transfers of
money in order to further and advance the success of the
Surcharge Scheme.

    (Title 18, United States Code, Sections 1343, 1349, and 2.)

<u>COUNT THREE</u>

(Prohibited Financial Transactions with Iraq)

The Grand Jury further charges:

    30.  Paragraphs One through Twenty-Three and Twenty-
Seven of this Indictment are realleged, repeated, and

incorporated by reference as if fully set forth herein.

       31.  From at least in or about mid-2000, up to and including in or about March 2003, in the Southern District of New York and elsewhere, DAVID B. CHALMERS, JR., OSCAR S. WYATT, JR., JOHN IRVING, LUDMIL DIONISSIEV, CATALINA del SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," MOHAMMED SAIDJI, BAYOIL (USA), INC., BAYOIL SUPPLY & TRADING LIMITED, NAFTA PETROLEUM COMPANY LIMITED, MEDNAFTA TRADING COMPANY LIMITED, and SARENCO, S.A., the defendants, at least one of whom was a United States person, and knowing and having reasonable cause to know that Iraq was a country designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism, did unlawfully and knowingly engage in financial transactions with the government of that country without complying with the licensing and authorization requirements of the Iraqi Sanction Regulations, to wit, CHALMERS, WYATT, IRVING, DIONISSIEV, MIGUEL, SAIDJI, the BAYOIL COMPANIES, the WYATT FOREIGN COMPANIES, and SARENCO, S.A., made and caused to be madepayments to the Government of Iraq that were unauthorized by and concealed from the United Nations' Oil-for-Food Program.

      (Title 18, United States Code, Sections 2332d and 2.)

<u>COUNT FOUR</u>

(<u>Violation of the International Emergency Economic Powers Act</u>)

The Grand Jury further charges:

32.   Paragraphs One through Twenty-Three and Twenty-Seven of this Indictment are realleged, repeated, and incorporated by reference as if fully set forth herein.

33.   Title 50, United States Code, Section 1701, <u>et seq.</u>, known as the International Emergency Economic Powers Act ("IEEPA"), grants the President the authority to, among other things, "investigate, . . . prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B).  Section 1701 grants the President the power to exercise this authority upon declaration of a national emergency.

34.   In Executive Order Number 12722, signed on August 2, 1990, President George H.W. Bush declared that "the policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States," and declared "a national emergency to deal with that threat."  On August 9, 1990, following passage of

26

United Nations Security Council Resolution Number 661 (which
dealt, in part, with sanctions placed on Iraq) on August 6, 1990,
the President issued Executive Order Number 12724.  Executive
Order Number 12724 took "additional steps with respect to Iraq's
invasion of Kuwait and the national emergency declared in
Executive Order Number 12722."  Executive Orders No. 12722 and
12724, prohibited certain trade-related activities with Iraq at
all times relevant to this Indictment.

   35.  Executive Order Numbers 12722 and 12724 (the
"Executive Orders") imposed economic sanctions, including a
complete trade embargo, on Iraq.  The Executive Orders
prohibited, among other things, the export to Iraq of any goods,
technology, or services from the United States and the
performance by any United States person of any contract in
support of an industrial, commercial, public utility or
government project in Iraq.  The Executive Orders also prohibited
other activities relating to Iraq.  For instance, Executive Order
12724 prohibited "any transaction by a United States person
relating to travel by any United States citizen or permanent
resident alien to Iraq, after the date of this order, other than
transactions necessary to effect (i) such person's departure from
Iraq, (ii) travel and activities for the conduct of the official
business of the Federal Government or the United Nations, or
(iii) travel for journalistic activity by persons regularly
employed in such capacity by a news-gathering organization."  In

addition, both of the Executive Orders specifically prohibited "[a]ny transaction by any United States person that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this order."  The Executive Orders defined the term "United States person" as "any United States citizen, permanent resident alien, juridical person organized under the laws of the United States (including foreign branches), or any person in the United States, and vessels of U.S. registration."

36.  From in or about 1990 through all times relevant to this Indictment, the President continued, on an annual basis, the national emergency with respect to Iraq.  These successive Executive Orders authorized the Secretary of Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.

37.  Pursuant to this authority, the Office of Foreign Assets Control ("OFAC"), the office within the Department of Treasury charged with the responsibility of administering sanctions against foreign persons and entities, promulgated regulations to implement the Executive Orders.  The relevant regulations are located in Section 575 of Title 31 of the Code of Federal Regulations, and state, in part:

      a.   "[N]o property or interests in property of the Government of Iraq that are in the United States, that hereafter come within the United States, or

that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported withdrawn or otherwise dealt in," and "any other dealing in any security (or evidence thereof) registered or inscribed in the name of the Government of Iraq and held within the possession or control of a U.S. person is prohibited," without first obtaining a license from OFAC.  31 C.F.R. § 575.201.  By virtue of these prohibitions against dealing in Iraqi government property, or securities or interests therein, "[a] U.S. person may not, within the United States or abroad, conduct transactions of any nature whatsoever with an entity that the U.S. person knows or has reason to know is an Iraqi government entity unless the entity is licensed by the Office of Foreign Assets Control to conduct such transactions with U.S. persons." 31 C.F.R. § 575.408(c)(2);

b.    "[N]o goods, technology (including technical data or other information), or services may be exported from the United States, or, if subject to U.S. jurisdiction, exported or reexported from a third country to Iraq, to any entity owned or controlled by the Government of Iraq, or to any entity operated from Iraq," without first obtaining a license from OFAC. 31 C.F.R. § 575.205;

c.    Except in circumstances not applicable here, "no U.S. person may deal in property of Iraqi origin exported from Iraq after August 6, 1990, property intended for exportation to Iraq, or property intended for exportation from Iraq to any other country, nor may any U.S. person engage in any activity that promotes or is intended to promote such dealing," without first obtaining a license from OFAC.  31 C.F.R. § 575.206;

d.    "[N]o U.S. person may engage in any transaction relating to travel by any U.S. citizen or permanent resident alien to Iraq, or to activities by any U.S. citizen or permanent resident alien within Iraq," without first obtaining a license from OFAC. 31 C.F.R. § 575.207;

e.    "[N]o U.S. person may perform any contract, including a financing contract, in support of an

industrial, commercial, public utility, or
governmental project in Iraq," without first
obtaining a license from OFAC.  31 C.F.R. §
575.209;

f.    "[N]o U.S. person may commit or transfer, directly
or indirectly, funds or other financial or
economic resources to the Government of Iraq or
any person in Iraq" without first obtaining an
OFAC license.  31 C.F.R. § 575.210; and

g.    "[A]ny transaction that has the purpose of, or
which has the effect of, evading or avoiding, or
which facilitates the evasion or avoidance of, any
of the prohibitions set forth in this subpart is
hereby prohibited.  Any attempt to violate the
prohibitions set forth in this part is hereby
prohibited.  Any conspiracy formed for the purpose
of engaging in transactions prohibited by this
part is hereby prohibited."  31 C.F.R. § 575.211.

38.  From at least in or about mid-2000, up to and
including in or about March 2003, in the Southern District of New
York and elsewhere, DAVID B. CHALMERS, JR., OSCAR S. WYATT, JR.,
JOHN IRVING, LUDMIL DIONISSIEV, CATALINA del SOCORRO MIGUEL
FUENTES, a/k/a "Cathy Miguel," MOHAMMED SAIDJI, BAYOIL (USA),
INC., BAYOIL SUPPLY & TRADING LIMITED, NAFTA PETROLEUM COMPANY
LIMITED, MEDNAFTA TRADING COMPANY LIMITED, and SARENCO, S.A., the
defendants, at least one of whom was a United States person,
unlawfully, willfully, and knowingly violated IEEPA, and the
regulations promulgated thereunder, as described above, to wit,
without obtaining the required OFAC approval, which transactions
were designed to and did allow those recipients to make payments
to the Government of Iraq unauthorized by and concealed from the
United Nations' Oil-for-Food Program, engaged in financial

30

transactions with the Government of Iraq, which transactions were

unauthorized by and concealed from the United Nations' Oil-for-

Food Program, and traveled to and from Iraq.

(Title 50, United States Code, Section 1701, et seq.; Public Law
101-513, Section 586E (November 5, 1990); Executive Orders 12722
and 12724; Title 31, C.F.R. Section 575.201, et seq.; and Title
18, United States Code, Section 2.)

COUNT FIVE

(Conspiracy to Act as an Unregistered Agent of a
Foreign Government, to Violate the Foreign Agents
Registration Act, and to Launder Money)

The Grand Jury further charges:

BACKGROUND

39.   Paragraphs One through Seven of the Indictment are

realleged, repeated, and incorporated by reference as if fully

set forth herein.

40.   From at least in or about 1992 up to and including

in or about December 2002, TONGSUN PARK, the defendant, a

cooperating witness not charged as a defendant herein ("CW-1"),

and others known and unknown, lobbied officials of the United

States Government and the United Nations to repeal sanctions

against the Government of Iraq, and to establish both the Oil-

for-Food Program and the terms and conditions under which the

Government of Iraq would and did participate in the Oil-for-Food

Program.   In the course of these efforts, PARK, in conjunction

with CW-1, consulted with and received direction from the

Government of Iraq and received payments from the Government of

31

Iraq.

41.   From at least in or about 1992 up to and including in or about December 2002, TONGSUN PARK, the defendant, was: (a) not a duly accredited diplomatic and consular officer of the Government of Iraq; (b) not an officially and publicly acknowledged and sponsored official and representative of the Government of Iraq; and (c) not an officially and publicly acknowledged and sponsored member of the staff of, and employee of, any such officer, official, and representative of the Government of Iraq.

<u>THE VIOLATION</u>

42.   From at least in or about 1992 up to and including in or about December 2002, in the Southern District of New York and elsewhere, TONGSUN PARK, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Section 951; Title 22, United States Code, Sections 612(a) and 618(a)(1); and Title 18, United States Code, Sections 1956(a)(2)(A) and (a)(7)(d).

43.   It was a part and an object of the conspiracy that TONGSUN PARK, the defendant, and others known and unknown, unlawfully, willfully and knowingly would and did act in the United States as agents of a foreign government, to wit, the Government of Iraq, without prior notification to the Attorney

32

General, as required by law, in violation of Title 18, United States Code, Section 951.

44.   It was further a part and an object of the conspiracy that TONGSUN PARK, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did act in the United States as agents of a foreign principal, to wit, the Government of Iraq, without registering with the Attorney General, as required by law, in violation of Title 22, United States Code, Sections 612(a) and 618(a)(1).

45.   It was further a part and an object of the conspiracy that TONGSUN PARK, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, funds from a place outside the United States, to wit, Iraq, to a place in the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, a violation of the Foreign Agents Registration Act of 1938, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (a)(7)(d).

<u>OVERT ACTS</u>

46.   In furtherance of this conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about February 1993, TONGSUN PARK, the defendant, arranged a meeting among PARK, CW-1, and a high-

ranking United Nations official ("U.N. Official #1") at the Manhattan residence of U.N. Official #1.

       b.   In or about 1995, CW-1 met with a staff member of an official of the United States Government to seek that official's support of a program under which the Government of Iraq would be allowed to sell oil and use the revenues to purchase humanitarian goods.

       c.   In or about February 1996, CW-1 traveled to Baghdad, where he participated in the drafting of agreements with an Iraqi official relating to the compensation of CW-1 and PARK for their efforts on behalf of the Government of Iraq with respect to Resolution 986.

       d.   In or about May 1996, near Washington, D.C., CW-1 gave PARK approximately $400,000 in cash that CW-1 had received in Manhattan from a representative of the Government of Iraq in partial satisfaction of the agreements referenced above in paragraph 46(c).

       e.   In or about 1996, PARK, CW-1, a high-ranking Iraqi official and a high-ranking United Nations official ("U.N. Official #2") met at a Manhattan restaurant.

       f.   In or about July 1997, CW-1 wrote a letter to a high-ranking Iraqi official in which CW-1 explained that both CW-1's group and the "Korean" group [a reference to PARK] were supposed to "take care" of U.N. Official #1 from the money that the two groups received pursuant to the agreements referenced

above in paragraph 46(c).

g.   In or about July 1997, PARK traveled to Iraq
to collect money from representatives of the Government of Iraq.

h.   In or about August 1997, PARK met U.N.
Official #2 in Manhattan to discuss PARK's investment in a
company in which U.N. Official #2 had a financial interest.

i.   On or about February 12, 2001, CW-1 and a
representative of the Government of Iraq signed a contract in
which Iraq agreed to sell CW-1 approximately 2 million barrels of
oil as part of the Oil-for-Food Program.

j.   In or about April 2001, CW-1 wrote a letter
to an official of the Government of Iraq, in which CW-1
emphasized his efforts on behalf of the Government of Iraq in the
United States and recommended that any required surcharges on his
oil allocations under the Oil-for-Food Program be deducted from
the amounts still owed to him under the agreements referenced
above in paragraph 46(c).

k.   On or about May 20, 2002, CW-1 sent a letter
to an official of the Iraqi Intelligence Service in which CW-1
emphasized his efforts on behalf of the Government of Iraq in the
United States and requested payment of the amounts still owed to
him under the agreements referenced above in paragraph 46(c).

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

47.  As a result of committing one or more of the
conspiracy and IEEPA offenses alleged in Counts One, Two, and
Four of this Indictment, in violation of 18 U.S.C. §§ 371, 1343,
and 1349, and 50 U.S.C. § 1701, et seq., DAVID B. CHALMERS, JR.,
OSCAR S. WYATT, JR., JOHN IRVING, LUDMIL DIONISSIEV, CATALINA del
SOCORRO MIGUEL FUENTES, a/k/a "Cathy Miguel," MOHAMMED SAIDJI,
BAYOIL (USA), INC., BAYOIL SUPPLY & TRADING LIMITED, NAFTA
PETROLEUM COMPANY LIMITED, MEDNAFTA TRADING COMPANY LIMITED, and
SARENCO, S.A., the defendants, shall forfeit to the United States
pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any
and all property, real and personal, that constitutes or is
derived from proceeds traceable to the commission of the
offenses, and all property traceable to such property, including
but not limited to:  a sum of money equal to at least $1 billion
in United States currency, representing the amount of proceeds
from sales of oil obtained as a result of the offenses charged in
Counts One, Two, and Four of this Indictment, for which the
defendants are jointly and severally liable.

## Substitute Assets Provision

48.  If any of the above-described forfeitable
property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due
diligence;

(b) has been transferred or sold to, or deposited with,

a third person;

      (c) has been placed beyond the jurisdiction of the

Court;

      (d) has been substantially diminished in value; or

      (e) has been commingled with other property which

      cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. §

853(p), to seek forfeiture of any other property of said

defendants up to the value of the above forfeitable property,

including, but not limited to the following:

1.   Any and all right, title, and interest in the real property and appurtenances known as 2205 Kingston Street, Houston, Texas, 77019 (Parcel #0560140000029, Harris County);

2.   Any and all right, title, and interest in the real property and appurtenances known as 3965 Del Monte Drive, Houston, Texas, 77019 (Parcel #0601620890002, Harris County);

3.   Any and all right, title, and interest in the real property and appurtenances known as 5936 Deerwood Road, Houston, Texas, 77057 (Parcel #0871770000009, Harris County);

4.   Any and all right, title, and interest in the real property and appurtenances known as 8145 S.W. 87th Terrace, Miami, Florida, 33142 (Parcel # 30-4034-025-0160, Dade County);

5.   Any and all right, title, and interest in the real property and appurtenances known as 9130 Center Point Drive, Houston, Texas, 77054 (Parcels # 109-038-000-0011 and 01-33947.0-00.0-0014.1-0/000-001-3 in Harris County);

6.   Any and all right, title, and interest in the real property and appurtenances known as Parcel # T210000267000201, Block 267, Lot 2A in Hidalgo

County, Texas;

7.   Any and all right, title, and interest in the real
     property and appurtenances known as Parcel #
     T210000267000212, Block 267, Lot 2 in Hidalgo
     County, Texas;

8.   Any and all right, title, and interest in the real
     property and appurtenances known as Parcel #
     T210000267000215, Block 267, Lot 2 (approx. 1
     acre) in Hidalgo County, Texas;

9.   Any and all right, title, and interest in the real
     property and appurtenances known as Parcel #
     T210000267000216, Block 267, Lot 2 (approx. 2.12
     acres) in Hidalgo County, Texas;

10.  Any and all right, title, and interest in the real
     property and appurtenances known as Parcel #
     T210000267000217, Block 267, Lot 2 (approx. 7.28
     acres) in Hidalgo County, Texas;

11.  Any and all right, title, and interest in the real
     property and appurtenances known as Parcel #
     T210000267000218, Block 267, Lot 2 (approx. 8.05
     acres) in Hidalgo County, Texas;

12.  Any and all right, title, and interest in the real
     property and appurtenances known as Parcel # 2139-
     0048-0000-000; Assessor's Map Reference Map J-10
     (approx. 356.8 acres) in San Patricio County,
     Texas;

13.  Any and all right, title, and interest in the real
     property and appurtenances known as Parcel # 2139-
     0134-0000-001; Assessor's Map Reference Map J-10
     (approx. 47 acres) in San Patricio County, Texas;

14.  Any and all right, title, and interest in the real
     property and appurtenances known as Parcel # 2139-
     0134-0000-002; Assessor's Map Reference Map J-10
     (approx. 342.4 acres) in San Patricio County,
     Texas;

15.  Any and all right, title, and interest in the real
     property and appurtenances known as Parcel # 2139-
     0134-0000-003; Assessor's Map Reference Map J-10
     (approx. 172.82 acres) in San Patricio County,
     Texas;

16. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0212-0000-003; Assessor's Map Reference Map I-9 (approx. 145.36 acres) in San Patricio County, Texas;

17. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0212-0000-005; Assessor's Map Reference Map I-9 (approx. 59 acres) in San Patricio County, Texas;

18. Any and all right, title, and interest in the real property and appurtenances known as 333 Highway 77 (SFR/approx. 1 acre) in San Patricio County, Texas (Parcel # 2139-0212-0000-006; Assessor's Map Reference Map I-9);

19. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0234-0000-004; Assessor's Map Reference Map K-10 and L-11 (approx. 741.4 acres) in San Patricio County, Texas;

20. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0270-0000-001; Assessor's Map Reference Map J-9 (approx. 109.5 acres) in San Patricio County, Texas;

21. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0270-0000-002; Assessor's Map Reference Map I-9 (approx. 938.4 acres) in San Patricio County, Texas;

22. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0296-0000-001; Assessor's Map Reference Map J-10 (approx. 514.2 acres) in San Patricio County, Texas;

23. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0331-0000-003; Assessor's Map Reference Map K-10 (approx. 154.8 acres) in San Patricio County, Texas;

24. Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-

0404-0000-003; Assessor's Map Reference Map I-9 (approx. 76.2 acres) in San Patricio County, Texas;

25.   Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0331-0000-002; Assessor's Map Reference Map L-10 (approx. 219.6 acres) in San Patricio County, Texas;

26.   Any and all right, title, and interest in the real property and appurtenances known as Parcel # 2139-0331-0000-003; Assessor's Map Reference Map L-10 (approx. 76.2 acres) in San Patricio County, Texas;

27.   Any and all right, title, and interest in the real property and appurtenances known as 13 South 13500th Street in Uintah County, Utah (Parcel #080040003);

28.   Any and all right, title, and interest in the real property and appurtenances known as Parcel # 90260001 (approx.40 acres) in Uintah County, Utah; and

29.   Any and all right, title, and interest in the real property and appurtenances known as Parcel # 90270001 (approx. 40 acres) in Uintah County, Utah.

(Title 18, United States Code, Sections 981, 1343 and 1349; Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461; and Title 50, United States Code, Section 1701, et seq.)

Berye Bradley
Foreperson

Michael Garcia
MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DAVID B. CHALMERS, JR.,
OSCAR S. WYATT, JR.,
TONGSUN PARK,
JOHN IRVING,
LUDMIL DIONISSIEV,
CATALINA del SOCORRO MIGUEL FUENTES,
a/k/a "Cathy Miguel,"
MOHAMMED SAIDJI,
BAYOIL (USA), INC.,
BAYOIL SUPPLY & TRADING LIMITED,
NAFTA PETROLEUM COMPANY LIMITED,
MEDNAFTA TRADING COMPANY LIMITED, and
SARENCO, S.A.,

Defendants.

INDICTMENT

S3 05 Cr. 59 (DC)

(18 U.S.C. §§ 371, 1343, 1349, 2332d,
and 2; 50 U.S.C. § 1701, et seq.; Public
Law 101-513, Section 586E (November 5,
1990); Executive Orders 12722 and 12724;
31 C.F.R. § 575.201, et seq.)

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

Betty Bradley
                                    Foreperson.